**Cleotha JONES, Plaintiff,**

v.

**P. MORAN; James Nixon; C. Shephard, Defendants.**

No. C–93–02073 CW.

United States District Court, N.D. California.

Aug. 21, 1995.

Cleotha Jones, Corcoran, CA, pro se.

Susan Duncan Lee, Deputy Attorney General, Daniel E. Lungren, Attorney General, San Francisco, CA, for defendants P. Moran, James Nixon, C. Shephard.

## ORDER GRANTING SUMMARY JUDGMENT

WILKEN, District Judge.

Plaintiff Cleotha Jones, a prisoner at Vacaville state prison, filed this civil rights action under 42 U.S.C. § 1983 regarding (1) his confinement in a Secured Housing Unit at Pelican Bay state prison beyond his scheduled release date from SHU and (2) Defendants' subsequent failure to transfer Plaintiff from the SHU at Pelican Bay back to Vacaville until two months after the Classification Security Representative ("CSR") approved such a move. Plaintiff, proceeding *in forma pauperis* and *pro se*, alleges that he was deprived of a liberty interest created by California Code of Regulations Title 15 § 3341.5 when Defendants retained him in SHU beyond his scheduled release date and continued to retain him after the CSR endorsed his transfer back to Vacaville. Defendants move for summary judgment, and Plaintiff opposes the motion.

After careful consideration of the parties' papers and the record as a whole, and good cause appearing, Defendants' motion is GRANTED in its entirety for the reasons stated below.

## STATEMENT OF FACTS

On September 17, 1992, Plaintiff was transferred from the California Medical Facility ("CMF") at Vacaville to a Secured Housing Unit (SHU) at Pelican Bay to serve a determinate term after being found guilty at a disciplinary hearing of assault on another inmate. Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment ("Defs' Memo"), Exhibit A. Plaintiff's Minimum Eligible Release Date ("MERD") from the SHU was November 18, 1992.

On October 8, 1992, an Institutional Classification Committee ("ICC") met to conduct a pre-MERD review of Plaintiff's case pursuant to California Code of Regulations Title 15 § 3341.5. Defs' Memo, Exhibit B, Classification Chrono [1] dated October 8, 1992. Plaintiff refused to appear. *Id.* The ICC recommended in his absence that he be transferred to a level IV general population at Folsom or Pelican Bay upon completion of his SHU term. *Id.* In its recommendation, the committee noted that Plaintiff had earlier been referred for psychiatric evaluation, which was still pending. *Id.* The committee referred the case with its recommendation to a Classification Staff Representative (CSR) for endorsement. *Id.*

California Department of Corrections ("CDC") records show that the committee's recommendation for transfer never reached a CSR. Defs' Memo, Exhibit C, Classification Chrono dated November 12, 1992. Before it reached a CSR, the committee retracted it because the psychiatric evaluation was still pending. *Id.*

On November 2, 1992, a preliminary psychiatric evaluation was completed. *Id.* Plaintiff was found to be actively psychotic. *Id.* The evaluation noted that Plaintiff had threatened to kill any inmate that came near him. *Id.* It found that Plaintiff was a serious danger to the safety of other inmates and staff.

In its November 12, 1992 meeting on the case, the ICC received the November 2 evaluation. *Id.* The committee noted that Plaintiff had "potential for extreme violence." *Id.* The committee also noted that while some mental health professionals considered Plaintiff to be psychotic and in need of in-patient psychiatric treatment, others considered Plaintiff to have a personality disorder rather than a treatable mental illness. *Id.* Plaintiff told the committee that he did not wish to go to the general population and that, if sent to the general population, he would do whatever necessary to anyone around him, including

---

1. A "chrono" is a memorandum recording information pertinent to a particular inmate. A copy of each chrono pertaining to a particular inmate is placed in that inmate's permanent prison record.

killing them. *Id.* The ICC found Plaintiff to be a serious danger to the safety of other inmates and staff if housed in the general population, and recommended that Plaintiff be retained at the Pelican Bay SHU for an indeterminate term, pending clarification of his current psychological status. *Id.*

On December 1, 1992, Plaintiff was reevaluated by a psychiatric treatment team, which reached agreement with CMF evaluators that Plaintiff should be transferred to CMF for evaluation as a candidate for Category "J," a psychiatric "outpatient" treatment program at Vacaville. Defs' Memo, Exhibit D, Classification Chrono dated December 3, 1992. On December 3, 1992, the ICC met again and received this information. *Id.* Plaintiff appeared and vehemently objected to the proposed transfer, threatening to kill staff and inmates if such a transfer was attempted. *Id.* The ICC recommended that Plaintiff be transferred to CMF for Category "J" evaluation and be retained in SHU on indeterminate status pending endorsement and transfer. *Id.* The recommendation was referred to the CSR for endorsement.

CDC records show that on December 17, 1992, a CSR endorsed the transfer to CMF Vacaville. Defs' Memo, Exhibit F, Classification Chrono dated December 17, 1992. Plaintiff was retained in SHU pending the transfer. *Id.* On January 6th, Plaintiff's retention in SHU was designated as administrative segregation pending transfer to Vacaville. Plaintiff's Memo, Exhibit D. Plaintiff was transferred to CMF on February 18, 1993. Defs' Memo, Exhibit A.

Plaintiff claims that his retention in SHU violated due process because he was retained by a classification committee beyond his scheduled release date from SHU. He also contends that Defendants violated due process by unreasonably delaying his transfer to Vacaville after the CSR approved his transfer on December 17, 1992. Plaintiff claims that during this two month period he should have been "placed in a hospital and cared for by professional people" instead of being held in solitary confinement in the Pelican Bay SHU for 22 hours a day. Plaintiff seeks damages.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

 Summary judgment is properly granted when no genuine and disputed issues of material fact remain, or when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Eisenberg v. Insurance Co. of North America,* 815 F.2d 1285, 1288–89 (9th Cir. 1987). Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

 The moving party bears the burden of showing that there is no material factual dispute. Therefore, the Court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Eisenberg,* 815 F.2d at 1289. The Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Intel Corp. v. Hartford Accident and Indem. Co.,* 952 F.2d 1551, 1558 (9th Cir. 1991).

## DISCUSSION

 Title 42 U.S.C. § 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. *Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989). To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements, first, that a right secured by the Constitution and laws of the United States was violated, and second, that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254–55, 101 L.Ed.2d 40 (1988); *Parratt v.*

*Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 330–331, 106 S.Ct. 662, 664–665, 88 L.Ed.2d 662 (1986); *Ketchum v. Alameda County,* 811 F.2d 1243, 1245 (9th Cir.1987). It is clear in the present case that the violations alleged constitute state action. The issue in this case is whether a right secured by the Constitution is implicated, and, if so, whether that right was violated.

Liberty interests of prison inmates protected by the Fourteenth Amendment may arise from two sources: the Due Process Clause itself and the laws of the States. *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1983); *Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987); *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1983).

■ While a criminal conviction and sentence of imprisonment extinguishes an individual's right to freedom from confinement for the term of his sentence, certain extraordinary deprivations of a prisoner's liberty implicate the Due Process Clause itself. *Vitek v. Jones,* 445 U.S. 480, 493–494, 100 S.Ct. 1254, 1263–1264, 63 L.Ed.2d 552 (1980). Such deprivations must be "qualitatively different from the punishment characteristically suffered by a person convicted of crime." *Id.* at 494, 100 S.Ct. at 1264. For example, in *Vitek,* the Supreme Court found that a prisoner had a liberty interest in freedom from involuntary commitment to a mental hospital. In *Washington v. Harper,* 494 U.S. 210, 221–222, 110 S.Ct. 1028, 1036–1037, 108 L.Ed.2d 178 (1990), the Court held that an inmate had a liberty interest in freedom from the involuntary administration of psychotropic drugs. Such deprivations implicate the Due Process Clause because they go beyond the "normal limits or range of custody which the conviction has authorized the State to impose." *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976).

■ Where a deprivation falls within the normal limits of custody authorized by the conviction, there is no liberty interest protected by the Due Process Clause itself. However, a state statute or regulation can create a right triggering due process protection "to insure that the state-created right is not arbitrarily abrogated." *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); *see also Meachum v. Fano,* 427 U.S. at 225–226, 96 S.Ct. at 2538–2539. In analyzing whether the claimed liberty interest was created by a state regulation in these cases, the Court focused on whether the regulation limited the discretion of prison officials by imposing substantive criteria. *See Meachum,* 427 U.S. 215, 226–28, 96 S.Ct. 2532, 2539–2540; *Wolff,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975. Thus, in *Wolff,* the Supreme Court found that while there was no right to good-time credits protected under the Due Process Clause itself, the State of Nebraska had created a protected liberty interest by providing a statutory right to good time credit which was to be forfeited only for serious misbehavior. 418 U.S. at 557, 94 S.Ct. at 2975. In contrast, in *Meachum,* the Court found that the State of Massachusetts had not conferred a protected right on its prisoners to remain in the prison to which they were initially assigned because the language of the applicable statute did not impose substantive criteria by conditioning transfer "upon the occurrence of specified events." 427 U.S. at 226–27, 96 S.Ct. at 2539. Rather, "prison officials have the discretion to transfer prisoners for any number of reasons" or "for no reason at all." *Id.* at 228, 96 S.Ct. at 2540.

■ In a series of cases beginning with *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court parsed the language of state statutes to determine whether they made state action mandatory or discretionary; the Court found that a protected liberty interest was created when the State went beyond merely adopting "procedural guidelines" and used "language of unmistakably mandatory character," to provide that the liberty will not be infringed unless specified substantive predicates were met. *Hewitt v. Helms,* 459 U.S. 460, 471–472, 103 S.Ct. 864, 871. *See also, Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). A liberty in-

terest was found where the regulation set forth explicit substantive criteria upon which denial of the benefit must be based, and which granted the decision maker no discretion to act otherwise. *Roberts v. Spalding,* 783 F.2d 867, 870 (9th Cir.1986).

However, the Supreme Court recently rejected the *Hewitt* test as placing too much emphasis on the "somewhat mechanical dichotomy" of "whether state action was mandatory or discretionary." *Sandin v. Conner,* —— U.S. ——, ——, 115 S.Ct. 2293, 2298, 132 L.Ed.2d 418 (1995). The Court adopted a new test intended to shift the emphasis in the liberty interest inquiry from a parsing of the language of the regulation purportedly creating a liberty interest to a consideration of the nature and significance of the purported liberty interest itself. *Id.* at ——, 115 S.Ct. at 2300.

The *Sandin* Court found that the *Hewitt* mandatory language approach had created two undesirable results. *Id.* at ——, 115 S.Ct. at 2299. First, the *Hewitt* analysis failed to consider the significance of the purported liberty interest, encouraging claims regarding minor deprivations wherever mandatory language was employed. *Id.* Second, the *Hewitt* approach created disincentives for states to codify prison management procedures using mandatory language. *Id.* Mandatory language in prison regulations assists prison officials to guide their subordinates in exercising their authority with uniformity in order to avoid widely different treatment of similar incidents. *Id.* The *Hewitt* approach led to the undesirable result that states could avoid creating liberty interests for prisoners only by having fewer mandatory regulations or by conferring standardless discretion on prison employees. *Id.*

The Court met these concerns by rejecting the *Hewitt* mandatory language analysis as sufficient in itself to create a liberty interest in prisoners and introducing a threshold test regarding the significance of a claimed liberty interest. *Id.* at ——, 115 S.Ct. at 2300. While *Sandin* confirms that the States may under certain circumstances create liberty interests which are protected by the Due Process Clause, the decision limits the range of such interests. These interests will be generally limited to freedom from (1) restraint which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," or (2) state action that "will inevitably affect the duration of [a] sentence." *Id.*

In *Sandin,* the Supreme Court found that inmate Demont Conner's confinement in SHU for disciplinary reasons was not an atypical, significant deprivation. *Id.* at ——, 115 S.Ct. at 2301. The Court analyzed the issue as follows. At the time of Conner's punishment, disciplinary segregation in Hawaii prisons, with insignificant exceptions, mirrored conditions imposed upon Hawaii inmates in administrative segregation and protective custody, and placement in administrative segregation and protective custody was totally within the discretion of prison officials. *Id.* Further, conditions in Hawaii's prisons involved significant amounts of "lockdown time" even for inmates in the general population.[2] *Id.* Because placement in segregated housing was completely discretionary and all prison confinement, even in the general population, typically involved significant amounts of lockdown, confinement in disciplinary segregation for thirty days did not "work a major disruption in [Plaintiff's] environment." *Id.* In addition, Conner's disciplinary record had been expunged. *Id.* Therefore, the Court concluded that Conner's confinement in disciplinary segregation did not implicate a liberty interest. *Id.* at ——, 115 S.Ct. at 2302.

■■■ The Supreme Court's decision in *Sandin* leaves open the possibility that, under different circumstances than those before the *Sandin* Court, an inmate could have a liberty interest in freedom from confinement in administrative segregation or the SHU. Indeed, it is unlikely that the Court intended to designate such freedom as an interest which would never meet the significance threshold. The Court's comparison of conditions of confinement in Halawa's SHU to the

---

**2.** Halawa prison's general population inmates are confined to cells anywhere from twelve to sixteen hours a day, depending on their classification. *Sandin,* at —— n. 8, 115 S.Ct. at 2301 n. 8.

conditions of other levels of confinement in Hawaii prisons suggests that the significance of a particular type of deprivation may vary from one state's prison system to another. While in the Hawaiian prison system, the conditions of SHU mirrored those of administrative segregation, protective custody, and even the general population, in other state prison systems, SHU may constitute a much more significant departure from the norm. Thus, in determining whether the threshold test is met, the circumstances of the particular state's prison system are relevant.

Because the Court found in *Sandin* that Conner's confinement in SHU did not meet the threshold test of significance of interest, the Supreme Court did not reach the issue of how to determine whether a state regulation creates a protected liberty interest when the threshold test is met. The Court stated only that "the time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum.*" *Sandin,* — U.S. at —, 115 S.Ct. at 2300. These decisions do not provide much guidance as the Court was not required in either case to engage in a substantive analysis to determine whether or not liberty interests were created by the state regulations at issue there.

The applicable statute in *Meachum* provided only that "the commissioner may transfer any sentenced prisoner from one correctional institution of the commonwealth to another," and imposed no limitations on the exercise of that broadly conferred discretion. The predicate for invoking the protection of the Due Process Clause was therefore "totally nonexistent" in that case. 427 U.S. at 227, 96 S.Ct. at 2540. "Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all." *Id.* at 228, 96 S.Ct. at 2540.

In *Wolff,* the Court pointed out that the state had not only provided a statutory right to good time, but also specified that good time was to be forfeited only for serious misbehavior. Where the State creates the right and recognizes that its deprivation is a sanction authorized for major misconduct, the prisoner's interest in the right has "real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." 418 U.S. at 557, 94 S.Ct. at 2975 (citations omitted).

Because the *Hewitt* test was itself an attempt to create a test to draw a distinction between the deprivations of state-created rights of "real substance" found protected in *Wolff* and expectations too "ephemeral and insubstantial" to merit due process protection under *Meachum,* it is unclear what the *Sandin* Court intends to change by returning from *Hewitt* to *Wolff* and *Meachum.* The Court may intend to do no more than add the "significant and atypical" threshold test specified above to the *Hewitt* analysis to ensure that due process protection is applied only to interests of "real substance."

Justice Brewer suggests in his dissent in *Sandin* that the majority does just that.[3] He bases this conclusion on the generality of the Court's standard, which would "threaten[ ] the law with uncertainty" if intended "to change prior law radically," and on his analysis that the concerns expressed by the Court are fully met by imposition of the threshold test. *Sandin,* — U.S. at —, 115 S.Ct. at 2306 (Breyer, J. dissenting). Justice Breyer further focuses on the difficulty of discerning whether a liberty interest has been created for the "broad middle category of imposed restrains or deprivations that, considered by themselves, are neither obviously so serious as to fall within, nor obviously so insignificant as to fall without, the [Due Process] Clause's protection" and the usefulness of looking to local law in that regard. *Id.* at —–—, 115 S.Ct. at 2306–07. Local rules which cabin the prison officials' discretionary power to

---

3. Justice Breyer dissented from the majority opinion because, applying the analysis indicated by the majority, he would have found that Conner's interest did meet the threshold test because the deprivation was significant and atypical.

impose a restraint suggest that, other things being equal, the matter is likely to be important to the inmate, likely "of a kind to which procedural protections historically have applied, and where they normally prove useful," and not likely to "call for the wise exercise of discretion." *Id.* at ——, 115 S.Ct. at 2307.

■■■ This Court agrees with Justice Breyer's well reasoned analysis of the *Sandin* majority opinion. The effect of *Sandin,* then, is to add a threshold test to the previous liberty interest analysis.

■■■ Applying *Sandin* to the present case, it is clear that Plaintiff's confinement in the SHU did not "go beyond the normal limits which [Plaintiff's] conviction has authorized the state to impose." *See Sandin,* at ——, 115 S.Ct. at 2298, *quoting Meachum v. Fano,* 427 U.S. at 225, 96 S.Ct. at 2538. There is no federally protected right not to be placed in administrative segregation. *See, Hewitt v. Helms,* 459 U.S. at 468, 103 S.Ct. at 869–70. Nor is there a federally protected liberty interest in transfer from one institution to another. *Meachum,* 427 U.S. at 225, 96 S.Ct. at 2538–39. Therefore, Plaintiff possessed no liberty interest in freedom from SHU confinement unless the interest was created by the applicable state regulation, California Code of Regulations Title 15 § 3341.5(c)(3).[4]

■■■ Prior to *Sandin,* the Ninth Circuit held that California has created a liberty interest in freedom from administrative segregation. *Toussaint v. McCarthy,* 801 F.2d 1080, 1098 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). Applying a *Hewitt* analysis, the court found that California Code of Regula-

tions Title 15 § 3335[5] provides the substantive predicates which, combined with the mandatory language in § 3339(a)[6], operate to create a liberty interest. *Id.* at 1097.

Although the Ninth Circuit has not addressed the question whether § 3341.5(c)(3) also creates a liberty interest in being released from punitive confinement in SHU, Chief Judge Thelton E. Henderson of this Court found such an interest in *Madrid v. Gomez,* 889 F.Supp. 1146, 1271–72 (N.D.Cal. 1995). The regulation explicitly and substantively limits the exercise of discretion by imposing a mandatory duty on state officials to release an inmate from the SHU unless one of three predicates are met. *Id.* Analogizing to *Toussaint,* the Court found that by employing such mandatory language, California similarly created a liberty interest in release from the SHU. *Id.*

The *Toussaint* and *Madrid* decisions, however, did not analyze the degree of hardship imposed on inmates by confinement in administrative segregation or SHU. Under the new rule of *Sandin,* the issue of whether the mandatory language in § 3341.5 creates a liberty interest is not reached unless it is first determined that Plaintiff's confinement in SHU imposed "atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life" or "[would] inevitably affect the duration of [a] sentence." *Sandin,* —— U.S. at ——, 115 S.Ct. at 2300.

The deprivations found in *Toussaint* and *Madrid* to implicate liberty interests in freedom from administrative segregation and in release from the SHU are distinguishable from the deprivation addressed in *Sandin.*

---

**4.** § 3341.5(c)(3) provides that "an inmate shall not be retained in SHU beyond the expiration of a determinate term or beyond 11 months, unless the classification committee has determined before such time that continuance in the SHU is required for one of the following reasons:

 (A) The inmate has an unexpired MERD from SHU.

 (B) Release of the inmate would severely endanger the lives of inmates or staff, the security of the institution, or the integrity of an investigation into suspected criminal activity or serious misconduct.

 (C) The inmate has voluntarily requested continued retention in segregation."

**5.** § 3335 permits placement in administrative segregation where the presence of the inmate in the general population poses a threat to his own safety and/or poses a threat to an ongoing investigation of serious misconduct or criminal activity.

**6.** § 3339(a) provides that release from segregation shall occur at the earliest possible time in keeping with the circumstances and reasons for the inmate's initial placement in administrative segregation.

Most significantly, in California, placement in administrative segregation is not totally discretionary as it is in the Hawaii regulatory scheme examined in *Sandin*. The *Sandin* Court relied on that total discretion to conclude that Conner's confinement did not exceed the ordinary circumstances of prison life. The present action, like *Toussaint* and *Madrid*, is thus distinguishable from *Sandin*.

However, there is no factual record in the instant case from which it can be determined whether Plaintiff's placement in SHU was a major disruption of the normal prison environment. Neither party had reason to offer proof on this issue. Ordinarily, the Court would give the parties opportunity to do so. However, for the reasons stated below, Plaintiff cannot prevail even if a liberty interest is implicated. Accordingly, the Court will assume for purposes of this opinion that solitary confinement in SHU does differ significantly from the ordinary incidents of prison life in the California prison system.

Assuming that freedom from solitary confinement in SHU meets the threshold test of *Sandin*, Section 3341.5 appears to create a liberty interest in inmates. The statute employs mandatory substantive criteria to curb official discretion. Prison officials may not retain a prisoner in SHU beyond his MERD absent a threat to prison security or a voluntary request by the inmate to remain in the SHU.

However, assuming that Plaintiff had a liberty interest in release from the SHU, that interest was not infringed by his retention in SHU beyond his scheduled release date of November 18, 1992 and pending his transfer to CMC because the mandatory language in § 3341.5, as well as the requirements of due process, were satisfied by the ICC findings. Section 3341.5(c)(3) provides that "an inmate shall not be retained in SHU beyond the expiration of a determinate term ... unless ... (B) release of the inmate would severely endanger the lives of inmates or staff, or (C) the inmate has voluntarily requested continued retention in segregation." Cal.Code Regs. Title 15, § 3341.5(c)(3). Both of these exceptions are applicable here.

 The Ninth Circuit has found that under the Due Process Clause, findings supporting administrative confinement in segregation may be made at an informal nonadversarial hearing. *Toussaint*, 801 F.2d at 1100–01. Such a hearing was held by the ICC. Due process does not require representation by counsel, an opportunity to present witnesses or a written decision describing the reasons for retention in administrative segregation. *Id.*

 Judicial review of placement in administrative segregation is severely restricted. *Toussaint*, 801 F.2d at 1103–1106. Courts must accord wide-ranging deference to prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 1104, citing *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). The Supreme Court's decision in *Superintendent v. Hill*, 472 U.S. 445, 455, 105 S.Ct. 2768, 2773–74, 86 L.Ed.2d 356 (1985) indicates that the due process clause requires only the existence of "some evidence" in support of prison administrator's segregation decision. A reviewing court may not reverse the administration's decision if "some evidence" supports the administration's decision. *Toussaint*, 801 F.2d at 1105–06.

In the instant case, the evaluations of Drs. Wissert and Fulton and Plaintiff's own statement before the ICC at the November 12, 1992 meeting that he did not want to go to the general population and "would do whatever necessary to anyone placed around him, including killing them," Defs' Memo, Exhibit C, constitute sufficient evidence that the ICC's decision to retain Plaintiff in SHU beyond November 18th satisfied the requirements of Section 3341.5(c)(3).

Plaintiff also claims that, after December 17, 1992, when the CSR endorsed the ICC's recommendation that he be transferred to CMF for category "J" evaluation, he should have been "placed in a hospital and cared for by professional people" rather than "kept in solitary confinement 22 hours every day in Pelican Bay." Motion in Opposition to Defendant's Response, p.2. Because an inmate has no liberty interest in transfer, the delay

**1276**

in Plaintiff's transfer to CMF was not a constitutional violation.

## CONCLUSION

Accordingly, the Court GRANTS Defendant's motion for summary judgment regarding retention of Plaintiff in SHU beyond his scheduled release date of November 12, 1992. The Court also GRANTS summary judgment regarding the retention of Plaintiff in administrative segregation pending transfer from December 17, 1992 to February 18, 1993.

IT IS SO ORDERED.

## JUDGMENT

For the reasons set forth in the Order Granting Summary Judgment filed August 21, 1995,

IT IS HEREBY ORDERED AND ADJUDGED

That Plaintiff Cleotha Jones take nothing, that the action be dismissed on the merits, and that each party shall bear its own costs.