124 F.3d 1094
 156 L.R.R.M. (BNA) 2216, 97 Cal. Daily Op.
Serv. 7134,
97 Daily Journal D.A.R. 11,505
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
J.W. Reinforcing Steel, Inc., Petitioner-Intervenor,
v.
DISTRICT COUNCIL OF IRON WORKERS OF THE STATE OF CALIFORNIA
AND VICINITY; Iron Workers Local Union No. 155,
International Union of Bridge, Structural and Ornamental
Iron Workers, AFL-CIO, Respondents.
 No. 95-70772.
 United States Court of Appeals,
Ninth Circuit.
 Argued Nov. 8, 1996.
Submission deferred Nov. 8, 1996.
Submitted Nov. 20, 1996.[1]
Decided Sept. 4, 1997.
 
 Margaret Gaines Neigus, Deborah E. Shrager, National Labor Relations Board, Washington, DC, for petitioner.
 Victor J. Van Bourg, Van Bourg, Weinberg, Roger & Rosenfeld, Oakland, CA, for respondents.
 Carla M. da Luz, Littler, Mendelson, Fastiff, Tichy & Mathiason, San Diego, CA, for intervenor.
 On Application for Enforcement of an Order of the National Labor Relations Board. NLRB No. 32-CB-4365.
 Before: FLETCHER, FARRIS, and TASHIMA, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 The National Labor Relations Board (the "Board") petitions for enforcement of an order issued against the District Council of Iron Workers of the State of California and Vicinity (the "District Council") and Iron Workers Local Union No. 155 of the International Union of Bridge, Structural and Ornamental Iron Workers, AFL-CIO ("Local 155").
 
 
 2
 The order of the Board finds that the District Council and Local 155 (collectively "the Unions") engaged in unfair labor practices in violation of Section 8(b)(3) and (d) of the National Labor Relations Act, as amended, 29 U.S.C. 151-160(a), ("the NLRA"), by repudiating and attempting to compel J.W. Reinforcing Steel, Inc. ("the Company") to agree to midterm modifications of the collective bargaining agreement. The order directs the Unions to cease and desist from failing or refusing to bargain collectively and in good faith with the Company and to honor the terms and conditions of the collective bargaining agreement. The Unions assert that they were not bound by the collective bargaining agreement at issue because it was negotiated by another local and they did not authorize or ratify it. They further argue that the Board violated due process by concluding that the absence of testimony by the Unions' employees and agents proved that their testimony, had they testified, would have been identical to that of the Company.
 
 
 3
 This case requires us to decide whether a standard form collective bargaining agreement ("the Standard Agreement") modified by a union representative for Iron Workers Local Union No. 118, Sven Sorensen, and signed by the Company's President, James Coker, binds a non-signing local, Iron Worker's Local 155, to its terms. The Board concluded that Local 155 was bound because both Locals 118 and 155 were members of the District Council of Ironworkers and the Standard Agreement incorporated by reference the terms of the District Council's Master Agreement.[2] We disagree.
 
 I. FACTUAL BACKGROUND
 
 4
 The Company initially operated as a nonunion subcontractor in Southern California installing reinforcing steel on various concrete construction sites. Prior to forming the Company in 1987, James Coker, the President, spent 27 years as an iron worker and was a long-term member of the Iron Worker's Union. In May 1992, the Company successfully bid on a subcontract for a State of California prison to be built in Blythe, California. This construction project was governed by the Davis-Bacon Act, 40 U.S.C. § 276a-7, which requires that prevailing wages be paid to the iron workers on covered jobs. None of the Company's prior work had been covered by a prevailing wage requirement.
 
 
 5
 On May 18, 1992, Coker signed a Standard Agreement with Iron Workers Local 416 for the Blythe Project. The agreement contained one typewritten modification, stating that the agreement was for "1 Job Agreement Blyth[sic] Prison." Without this modification, the Standard Agreement would have encompassed statewide coverage. On June 3, 1992, Richard Zampa, president of the District Council, wrote to Coker, enclosed a file-stamped copy of the Blythe agreement and a standard benefits packet, and thanked him for signing the agreement.
 
 
 6
 On January 7, 1993, Coker signed another modified Standard Agreement, again for "One Job Only," with Local 155 for a sub-contract to install reinforcing steel at the Coalinga, California prison. On February 8, 1993, Coker received another letter from Zampa stating his thanks for the Coalinga agreement, enclosing a file-stamped copy and a benefits payment packet. Joe Roth, the union representative for Local 155, told Coker while the Coalinga project was underway that he would not be allowed another one-job agreement.
 
 
 7
 In February 1994, the Company was awarded work on the Susanville, California prison. Coker met with Sven Sorensen, the union representative of Local 118, to discuss a union contract. Coker refused to sign a statewide agreement but acknowledged that he had been told by Roth, Local 155's representative, and by the Iron Worker's business agent in San Diego, that he would no longer be awarded a one-job agreement. Coker signed a modified Standard Agreement with Sorensen. It contained the following typewritten notations:
 
 
 8
 This agreement is for the Susanville Prison project and/or any work bid north of the L.A. county line.
 
 
 9
 The employer shall be allowed to bring in 4 key employees.
 
 
 10
 The fringe benefits for this project shall be joint checked with McCarthy.
 
 
 11
 Coker did not receive a letter from the District Council enclosing a file stamped copy of the agreement, as he had for the Blythe and Coalinga modified Standard Agreements. He did receive the typical benefits payment packet and made all payments as required during the project.
 
 
 12
 In March 1994, he received a phone call from District President Zampa, who stated that he was aware of the Susanville Agreement and "he wasn't happy with it." Coker asked Zampa if he would accept the past due amounts for the Company's latest fringe benefit payment and waive the delinquent fees. Zampa responded that he would not waive the fees unless Coker signed "a full statewide agreement and [did] away with the Susanville Independent Agreement." Coker did not agree, and paid the past due amount and the delinquent fees.
 
 
 13
 In August 1994, the Company was awarded a second-tier subcontract for work at Soledad State Prison, which is north of the Los Angeles County line and within the jurisdiction of Local 155. Because the primary subcontractor, J.L. Davidson, was a party to the Master Agreement, it could only subcontract to other Master Agreement signatories. Local 155 refused to recognize the Susanville Agreement and refused to supply ironworkers to the Company's Soledad job site unless Coker signed a statewide agreement. As a result of this impasse, J.L. Davidson sent the Company a letter on October 20, 1994 stating that it was unable to award it the subcontract because this would violate the terms of its Master Agreement. J.L. Davidson had iron workers dispatched directly to it, and hired Coker to supervise their work. The Company then filed a charge of unfair labor practices.
 
 
 14
 After a hearing before an administrative law judge ("ALJ"), the Unions were found to have acted in violation of Section 8(b)(3) and (d) of the NLRA by repudiating the Susanville Agreement and attempting to compel the Company to agree to midterm modifications of the collective bargaining agreement by agreeing to a statewide agreement. Specifically, the ALJ found that Sorensen acted as an agent of the District Council and therefore had bound it, and its members, to the terms of the Susanville Agreement. The Board adopted the findings of the ALJ and ordered the Unions to cease and desist from failing or refusing to bargain collectively and in good faith with the Company.
 
 II. DISCUSSION
 A. Standard of Review
 
 15
 We have jurisdiction over the unfair labor practice proceeding below under Section 10(e) of the NLRA, as amended (29 U.S.C. 160(e)). The order of the Board will be enforced if its findings of fact are supported by substantial evidence and if it correctly applied the law. California Pac. Medical Ctr. v. NLRB, 87 F.3d 304, 307 (9th Cir.1996). The substantial evidence test is essentially a case-by-case analysis requiring review of the whole record. Id. We defer to the Board's reasonable interpretation and application of the NLRA. NLRB v. Unbelievable, Inc., 71 F.3d 1434, 1438 (9th Cir.1995). However, questions of the interpretation of collective bargaining agreements, here the terms of the Standard Agreement and Master Agreement, are reviewed de novo. Litton Financial Printing Div. v. NLRB, 501 U.S. 190, 202, 111 S.Ct. 2215, 2223, 115 L.Ed.2d 177 (1991).
 
 B. Agency
 
 16
 We must determine whether Sorensen, as union representative for Local 118, was an agent of the District Council and its member locals with the authority to bind the member locals, including Local 155, to Standard Agreements modified without their consent. If Sorensen was an agent of the Unions, no ratification by the District Council of the Susanville Agreement was necessary for it to be binding upon Local 155.
 
 
 17
 Under the NLRA, common law agency principles govern the Union's responsibility for the actions of its officers and members. NLRB v. Advanced Systems, Inc., 681 F.2d 570, 576 (9th Cir.1982). Accordingly, implied or apparent authority is sufficient to establish agency under the NLRA. Id. (citing Hasbrouck v. Sheet Metal Workers Local 232, 586 F.2d 691, 693 (9th Cir.1978)). The Board found that Sorensen was the agent of the Unions under three theories: express actual, implied actual, and apparent authority. Upon review, we find each basis unsupported by substantial evidence in the record.
 
 
 18
 Express actual authority derives from an act specifically mentioned to be done in a written or oral communication. Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co., 414 F.2d 750, 755 (9th Cir.1969). Implied actual authority comes from a general statement of what the agent is supposed to do; an agent is said to have the implied authority to do acts consistent with that direction. Id. Sorensen did not have actual authority, either express or implied, to negotiate modified Standard Agreements on behalf of the District Council.
 
 
 19
 The Board found Sorensen's express authority in the preamble to the Master Agreement which states that the District Council and the locals "are recognized as the collective bargaining representatives of the employees." This descriptive language does not outline the rights and responsibilities of one local to another or signatory locals to the District Council. The Master Agreement is geographically organized, underscoring the distinct authority of each of the affiliated locals and includes maps which show the territorial jurisdiction of each. And it clearly does not contemplate modification by one local that would bind others; Section 31 states "[t]his Agreement contains all the provisions agreed upon by the Employers and the Union. Neither the Employers nor the Union will be bound by rules, regulations or agreements not herein contained except interpretations or decisions of the Joint Adjustment Board pursuant to Section 28."[3] Section 33 provides for modifications of the agreement within specific geographic areas only by a special Committee consisting of three members appointed by the District Council and three appointed by the Employers. These modifications are to be reviewed biannually. Finally, in Los Angeles Marine Hardware Co. v. NLRB, 602 F.2d 1302, 1306 (9th Cir.1979), we rejected an employer's defense to a charge of unilateral contract modification that relied upon language found only in an agreement's preamble, but was contradicted by the substantive terms of the agreement itself.
 
 
 20
 The Board found Sorensen's implied actual authority in language in the Standard Agreement stating that the agreement is made between the "individual employer and the District Council ... for and on behalf of its affiliated ... Local Unions ...." and in the signature section of the form, which has the District Council's name typed immediately above the signature block for the local union. However, neither the language nor the structure of the Standard Agreement grants a local union the power to make modifications such as the one negotiated by Sorensen that would bind another local or the Council.
 
 
 21
 Both the Standard Agreement and the Master Agreement contemplate statewide agreements by employers: Paragraph 2 of the Standard Agreement states that the employer agrees to recognize the Union "at all job sites located within the State of California and [portions of] the State of Nevada." It was not in the interest of Southern California locals to allow the Company to agree only to Northern California union work and it was therefore not consistent with the District Council's general grant of authority to local representatives to sign up employers to the Master Agreement who would agree only to limited territory, leaving them free to use non-union labor elsewhere in the Council's jurisdiction.
 
 
 22
 Without actual authority, Sorensen could bind the District Council only if he had apparent authority. Apparent authority arises from the principal's manifestations to a third party that supplies a reasonable basis for that party to believe that the principal has authorized the alleged agent to do the act in question. NLRB v. Donkin's Inn, 532 F.2d 138, 141 (9th Cir.1976), cert. denied, 429 U.S. 895, 97 S.Ct. 257, 50 L.Ed.2d 179 (1976). If the District Council (principal) supplied a reasonable basis for Coker (third party) to believe that it had authorized Sorensen (agent) to modify the Standard Agreement, no ratification would be required.
 
 
 23
 Apparent authority cannot be established merely by showing that Sorensen claimed authority or purported to exercise it, but must be established by proof of something said or done by the District Council on which Coker reasonably relied. Moreau v. James River-Otis, Inc., 767 F.2d 6, 10 (1st Cir.1985) (rejecting argument that union locals had apparent authority to negotiate side agreements solely on the basis of their signing the master collective bargaining agreement on behalf of the international union).
 
 
 24
 The Board found that the District Council's actions supplied a reasonable basis for Coker to believe that it had authorized Sorensen to modify the terms of the Standard Agreement and make those modifications binding upon other affiliated locals. First, because it sent letters acknowledging the Blythe and Coalinga Agreements along with file stamped copies of those agreements. Second, because District Council president Zampa notified Coker that he was unhappy with the Susanville Agreement in March, 1994, but did not state that it was invalid. Third, because there was no indication by the District Council to Coker that its ratification was a condition precedent to implementation of a modified Standard Agreement.
 
 
 25
 The Unions counter that Coker's assumption that Sorensen was empowered to bind the District Council and Local 155 was not reasonable given knowledge gained from his 27-year tenure as an ironworker and long-term union membership. They argue that he was familiar with the geographical jurisdictions of the different locals; that he had been notified by both Local 155 and the Union's business agent that he would be allowed no more one-job agreements; that the Susanville Agreement, unlike the Blythe and Coalinga Agreements, covered an area beyond the jurisdiction of Local 118; and that it was the only one unaccompanied by a letter of acknowledgment from Zampa and a District Council stamped file copy. From this they conclude that substantial evidence did not support the Board's finding of agency. We agree.
 
 
 26
 The Board based its holding on principles of implied agency that are of doubtful relevance to the facts of this case. In its defense of the order, the Board relies upon precedents in which an agent of a union or employer is held to create liability for that union or employer; not one addresses the liability of one entity for the acts of the agent of another entity or the authority of union agents to negotiate binding agreements for locals other than their own. See The 3-E Co. v. NLRB, 26 F.3d 1, 3-4 (1st Cir.1994) (employer held liable for the actions of a company vice-president, who laid-off or transferred union workers in violation of their right to organize.); Mullett v. NLRB, 571 F.2d 1292 (4th Cir.1978) (conduct of union's business manager and steward attributable to the union because they had apparent authority to enforce union's employment policies); NLRB v. Donkin's Inn, Inc., 532 F.2d 138, 141 (9th Cir.1976) (company's attorney found to have apparent authority to enter into a contract with the union); NLRB v. Local 3, International Brotherhood of Elec. Workers, 467 F.2d 1158, 1159 (2d Cir.1972) (union local found liable for threats made to pull union workers off construction work by a steward and two foremen).
 
 
 27
 It is arguable that the District Council's representations were sufficient to supply Coker with a reasonable basis to believe that Sorensen had the authority to negotiate a one-job agreement for work done within Local 118's jurisdiction, subject to approval by the District Council. At most, that is all we can infer from its acknowledgment of the Blythe and Coalinga Agreements. But the Board's extension of Sorensen's authority to make binding modifications for other locals is unsupported by the record.
 
 
 28
 The Board found signatory locals to the Master Agreement to be "engaged in a joint venture existing at least in part for the purpose of negotiating, administering, and enforcing collective-bargaining agreements on a joint basis with employers in the building and construction industry including the collective-bargaining agreements with [the Company]."
 
 
 29
 We do not dispute the Board's finding that by virtue of their membership in the District Council, Local 118 and Local 155 were in a joint venture for the specific purpose of signing up employers to the Master Agreement via the Standard Agreement. But we find no evidence in the record to support the Board's contention that this joint venture extended an authorization to affiliated locals to modify the Standard Agreement and bind other locals to these modifications via their membership in the District Council.
 
 
 30
 Rather, we find that the coordinated activity or authorization necessary to find agency in the relationship of locals one to another is absent on this record. See Sine v. Local No. 992, 730 F.2d 964, 966 (4th Cir.1984) (district council not agent of local union where council was not a party to the collective bargaining agreement, even though its lawyer had assisted the complaining employee and its employees had sat on the joint grievance committee); Asbestos Workers, Local Union 16, 163 NLRB 511 (1967) (local union not agent of trade council when council pickets job site and local had not requested or authorized the picketing).
 
 
 31
 We find the common law of agency as applied to the negotiation and ratification of side agreements to collective bargaining agreements applicable to this closely analogous situation. Ratification is necessary by those who are not parties to a side agreement, unless the employer had been previously informed by the principal that locals had the actual authority to independently enter into side agreements or unless the locals had the apparent authority to do so, via a "general practice" of entering into side agreements without ratification. See JSP Agency, Inc. v. American Sugar Refining Co., 752 F.2d 56, 62 (2nd Cir.1985) (finding that an association that had signed a master contract was not bound by the terms of a separately negotiated and separately signed job security agreement because the association was not a party to the side agreement and had not formally adopted it); Moreau v. Local Union No. 247, 851 F.2d 516, 519 (1st Cir.1988) (finding that local unions did have authority to negotiate side agreements on issues of local concern without approval from the International because the International's agent had explicitly notified the employer that the local unions had such authority); Central States Southeast v. Kraftco, Inc., 799 F.2d 1098, 1113 (6th Cir.1986) (finding ratification of side agreements unnecessary if there was a general practice of negotiating them without ratification).
 
 
 32
 There is no evidence that the District Council ever told Coker that Sorensen had the authority to bind the District Council and its affiliates to modified Standard Agreements; in fact District Council President Zampa explicitly stated that he was unhappy with the agreement. Further, Coker had been told by both Local 155 and the Union's business agent before he negotiated with Sorensen that no more one-job agreements would be acceptable. There is no evidence that Local 155 was a party to the side agreement that the Board claims is binding upon it. There is no evidence that there was a general practice of negotiating modified agreements binding on other locals without ratification; to the contrary, even the modified agreements that were binding only upon the signatory locals were accompanied by a letter of acknowledgment from Council President Zampa and a stamped file copy; Coker did not receive a letter or a stamped copy of the Susanville Agreement. On this record, we find that it would have been unreasonable for Coker to believe that Sorensen was authorized by the District Council to negotiate binding agreements for other locals. Accordingly, we find that the Susanville agreement was not binding upon Local 155.
 
 
 33
 C. Negative Inferences from Failure to Testify
 
 
 34
 The unions assert that it was a violation of due process for the Board to conclude that the absence of their testimony permitted the negative inference that had they testified, their testimony would have been identical to the company's testimony. We disagree. The Board properly asserts that this practice is well established. See Golden State Bottling Co. v. NLRB, 414 U.S. 168, 174, 94 S.Ct. 414, 420, 38 L.Ed.2d 388 (1973); NLRB v. Cornell of California, Inc., 577 F.2d 513, 517 (9th Cir.1978). Further, the ALJ did not base her conclusion on this inference alone.
 
 III. CONCLUSION
 
 35
 The petition for enforcement of the Board's order is DENIED. The Susanville agreement does not bind Local 155 or the District Council because Sorenson did not have the authority to agree to a modified Standard Agreement without consent unless ratified. The Company's request for sanctions is DENIED.
 
 TASHIMA, Circuit Judge, dissenting:
 
 36
 I must, respectfully, dissent because the Board did not err in applying accepted principles of agency law to conclude that Sorensen had apparent authority to enter into the Susanville Agreement. The Board's order, applying those principles to this case, is supported by substantial evidence and should be enforced.
 
 
 37
 The Board used well-established, common law principles of agency law to determine whether Sorensen had the authority to enter into the Susanville Agreement. The majority concludes that those principles are inapplicable here and, instead, creates and applies a different test to determine whether apparent authority existed. There is no reason to depart from the traditional agency test in this case. Indeed, the majority fails both to explain why such a departure is warranted and to provide adequate support for the adoption of its new test.
 
 
 38
 The majority explicitly acknowledges the existence of an established common law test to determine if apparent authority exists:
 
 
 39
 Apparent authority arises from the principal's manifestations to a third party that supplies a reasonable basis for that party to believe that the principal has authorized the alleged agent to do the act in question.
 
 Majority Opinion at 1099.[1]
 
 40
 However, instead of applying that traditional test, the majority finds "the common law of agency as applied to the negotiation and ratification of side agreements to collective bargaining agreements applicable to this closely analogous situation." Majority Opinion at 1100. According to the majority, there is apparent authority in that context only if there is a "general practice" of entering into side agreements without ratification. The majority errs in departing from the established and accepted test and adopting instead its own "general practice" test. There is no reason to adopt a different test for apparent authority in this context and the majority offers none.
 
 
 41
 The majority does appear to find significant that Sorensen's actions implicated locals other than his own. However, questions of apparent authority in both inter-union and intra-union contexts involve identical considerations: the balancing of the potential absence of actual authority against the protection of a third party's reasonable reliance on a principal's representations regarding the agent's power to bind the principal.
 
 
 42
 More importantly, the "general practice" test described by the majority simply does not exist. The opinion cites three out-of-circuit cases in support of its adoption of this test. None of them, however, so holds. The first, JSP Agency, Inc. v. American Sugar Ref. Co., 752 F.2d 56 (2d Cir.1985), does not contain any discussion or application of agency law. The second, Moreau v. Local Union No. 247, Int'l Bhd. of Firemen, 851 F.2d 516 (1st Cir.1988), applies the traditional common law standard used to determine whether there is apparent authority. It does not purport to apply, or even discuss, a different standard of apparent authority for special contexts. The third case, Central States Southeast and Southwest Areas Pension Fund v. Kraftco, Inc., 799 F.2d 1098 (6th Cir.1986), neither adopts nor applies a standard of apparent authority different from the customary common law test.
 
 
 43
 Instead of applying a test which does not exist, or needlessly creating a new one, I would apply the time-tested common law rule of apparent authority. It is clear that, under that test, the Board's decision finding apparent authority is supported by substantial evidence. It is undisputed that each local had authority to sign up employers to the Master Agreement. Further, the District Council had made clear to Sorensen that locals were also authorized to sign up an employer to the Master Agreement for only one job or project.[2] Through its acknowledgement of a local's authority to enter into one-job agreements, the District Council gave Sorensen a reasonable basis to believe that a local also was authorized to sign up an employer to the Master Agreement for only a portion of the geographical area covered by the Master Agreement.
 
 
 44
 The Susanville Agreement was not so different from the prior one-job agreements, with respect to deviations from the contemplated scope of the Master Agreement, that, as a matter of law, the Board was required to find that Sorensen lacked even apparent authority to execute it. The Susanville Agreement's restriction of the geographical scope of the Master Agreement no more modified the Master Agreement than did the previous one-job agreements. Those agreements embodied a temporal restriction to the applicability of the Master Agreement, while the Susanville Agreement's "jobs north of Los Angeles" restriction was a geographical restriction.[3] Given the established practice authorizing a local to "modify" the Master Agreement by limiting its temporal reach through one-job agreements, substantial evidence supports the Board's finding that apparent authority existed for a local similarly to limit the Master Agreement's geographical reach.
 
 
 45
 The Board correctly identified the principles of agency law applicable to this case and its finding that the Unions engaged in unfair labor practices is supported by substantial evidence. Because I would grant the petition for enforcement, I dissent.
 
 
 
 [1]
 The panel finds this case appropriate for submission on the briefs without oral argument pursuant to Fed. R.App. P. 34(a) and 9th Cir. R. 34-4
 
 
 [2]
 The Standard Agreement provides, in part:
 It is hereby mutually understood and agreed by and between the undersigned individual employer and the District Council ... for and on behalf of its affiliated California Field and Iron Worker Local Unions, that ... the undersigned employer agrees to comply with all wages, hours, working conditions, provisions and rules set forth in the [Master Agreement] which is ... incorporated herein by reference.
 
 
 [3]
 Section 28 states in relevant part that Boards of Adjustments will be composed of two representatives of the Union and two selected by employers
 
 
 [1]
 Apparent authority also results when the principal "permits the agent to do something which reasonably leads another to believe that the agent had the authority he purported to have." Hawaiian Paradise Park Corp. v. Friendly Broad. Co., 414 F.2d 750, 756 (9th Cir.1969). In addition:
 The principal's manifestations giving rise to apparent authority may consist of direct statements to the third person, directions to the agent to tell something to the third person, or the granting of permission to the agent to perform acts and conduct negotiations under circumstances which create in him a reputation of authority in the area in which the agent acts and negotiates.
 Id.
 
 
 [2]
 The majority appears to suggest, based on the letters from Council President Zampa, that the two prior one-job agreements could not provide Coker with a reasonable basis to believe that locals were authorized to enter into such agreements because these were not effective until ratified by the District Council. This suggestion is unsupported by the record. The letters from Zampa merely acknowledged an already completed agreement; they in no way purported to ratify the one-job agreements. In its decision, the Board explains in detail why these letters could not have been construed as suggesting the need for ratification of one-job agreements by the District Council
 
 
 [3]
 Of course, the one-job agreements, by definition, also contained a geographical restriction, i.e., restriction to one job necessarily included restriction to one geographical location-where the one job was located