**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SUSAN SALYERS, an individual,
*Plaintiff-Appellant*,

v.

METROPOLITAN LIFE INSURANCE
COMPANY, Guardian Ad Litem,
MetLife, Inc.,
*Defendant-Appellee.*

No. 15-56371

D.C. No.
2:14-cv-07490-
PA-JC

OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted March 6, 2017
Pasadena, California

Filed September 20, 2017

Before: Harry Pregerson, Richard A. Paez,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Pregerson

## SUMMARY[*]

### Employee Retirement Income Security Act

The panel reversed the district court's judgment in favor of the defendant following a bench trial in an ERISA action concerning life insurance.

The plaintiff bought a $250,000 life insurance policy on her husband, but the defendant insurer paid out only $30,000 because the plaintiff had not submitted evidence of insurability with her coverage election, as required under the ERISA-governed benefits plan.  The panel held that the defendant waived the evidence of insurability requirement because it did not ask the plaintiff for a statement of health, even as it accepted her premiums for $250,000 in coverage. The panel held that, under the federal common law of agency, the knowledge and conduct of the policyholder-employer could be attributed to the defendant.  The panel remanded the case to the district court with instructions to enter judgment in favor of the plaintiff for the amount of the $250,000 policy that remained unpaid.

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Christian J. Garris (argued), Law Offices of Christian J. Garris, Los Angeles, California, for Plaintiff-Appellant.

Ian Seth Linker (argued), Metropolitan Life Insurance Co., New York, New York; Misty A. Murray, Hinshaw & Culbertson LLP, Los Angeles, California; for Defendant-Appellee.

---

**OPINION**

PREGERSON, Circuit Judge:

Plaintiff-Appellant Susan Salyers ("Salyers"), a nurse at Providence Health & Services ("Providence"), bought a $250,000 life insurance policy on her husband through an ERISA-governed benefits plan. Salyers paid premiums commensurate with that amount of coverage. When Salyers's husband died shortly thereafter, Defendant-Appellee Metropolitan Life Insurance Company ("MetLife") paid out only $30,000. MetLife refused to pay the full $250,000 because Salyers had not submitted evidence of insurability with her coverage election, as required under the plan. After unsuccessfully appealing the denial of benefits through MetLife's administrative process, Salyers filed suit against MetLife. The district court conducted a bench trial and entered judgment for MetLife. Salyers appealed. We reverse.

**FACTUAL AND PROCEDURAL BACKGROUND**

Salyers is a nurse at Providence. She was a participant in an ERISA-governed employee welfare benefits plan ("the Plan") that provided, among other benefits, dependent life

insurance.  MetLife issued the group policy that funded life insurance benefits under the Plan.

At the time Salyers first applied for dependent life insurance in 2013, the Summary Plan Description listed eligibility requirements for Dependent Life Insurance coverage and described "How the Plan Works":

> Each fall you elect your Dependent Life benefit options to be effective for the next calendar year.  During your first enrollment as newly benefits eligible employee [sic], you may select any amount of spouse/Adult Benefit Recipient domestic partner coverage up to $50,000 without evidence of insurability (statement of health).  After the first year, spouse/Adult Benefits Recipient domestic partner coverage amounts may be increased by one level per year for coverage levels up to and including $50,000.  No evidence of insurability is required for this increase.  Evidence of insurability is required for any coverage amount above $50,000 or for any increase of more than one benefit level.

On August 15, 2013, Salyers submitted her benefits elections to Providence.  On the Benefits Enrollment Form, which warns that "MetLife may require evidence of insurability depending on your election," Salyers elected life insurance coverage in the amount of $20,000 for herself and $20,000 for her spouse, Gary Wolk ("Gary").  Because Salyers elected only $20,000 in coverage for Gary, no evidence of insurability was required.

Although Salyers elected only $20,000 in coverage for Gary, Providence mistakenly entered $500,000 in its system. Due to this administrative error, Providence deducted premiums from Salyers's paycheck based on $500,000 in coverage during the last four months of 2013. During that time, neither Providence nor MetLife asked Salyers to submit a statement of health or any other evidence of insurability for Gary's 2013 coverage.[1]

During the next open enrollment period, Salyers elected $250,000 in life insurance coverage for Gary, effective January 1, 2014. The 2014 Plan documents reiterated that evidence of insurability was required for elections of coverage of over $50,000. The Plan's 2014 open enrollment guide stated that "any coverage you elect requiring a statement of health will not take effect until approved by MetLife." Salyers did not submit a statement of health or other evidence of insurability with her 2014 election. Nonetheless, Salyers's premium payments were adjusted to reflect her new election of $250,000 in coverage, and, again, neither Providence nor MetLife asked for a statement of health or other evidence of insurability.[2]

---

[1] None of the Plan documents in the record define "evidence of insurability" or "statement of health," and no statement of health form appears in the record.

[2] According to a MetLife employee's notes, "Typically[,] if an employee wants to elect an amount that requires SOH [(a statement of health),] Providence would put the amount of life insurance at the max without SOH ($50k for spouse life), mark it as pending, wait for the SOH to be approved by MetLife and send a letter. This was not done." Apparently, because Salyers's 2014 election of $250,000 was lower than the mistakenly-entered $500,000 from the prior year's enrollment, Providence's system did not flag the new coverage election.

Gary died on January 10, 2014. On January 15, 2014, Providence sent a letter to Salyers offering its condolences and stating that Salyers had $250,000 in coverage for Gary. On January 20, 2014, Salyers submitted a claim for benefits to MetLife. Accompanying the claim was an Employer's Statement from Providence, which said that Salyers had been enrolled in the Plan effective September 1, 2013, and that she had $250,000 in dependent life insurance coverage for Gary.

Upon receiving the claim, MetLife confirmed with Providence that there was no statement of health on file for Gary, which led Providence to discover its keystroke error from the 2013 enrollment. Providence then submitted a revised Employer's Statement to MetLife, which stated that Gary had life insurance coverage in the amount of $30,000. This amount reflected the coverage for which Gary was eligible under the Plan without providing evidence of insurability: the initial election of $20,000 in 2013, plus a "one level" increase of $10,000 for the following year.

MetLife ultimately paid Salyers $30,000, and Providence refunded the premiums that were deducted from Salyers's paychecks based on the unapproved higher coverage amount. Salyers called MetLife to ask why it had not paid the full $250,000. Around that time, a MetLife employee wrote a note in the file explaining that the full amount should be paid:

> Providence has asked if we can pay this, since the employee had been enrolled in this amount and was paying premiums. On their enrollment confirmations it was showing this amount, so the employee thought that was their coverage. I do agree with their assessment that this should be paid since the

> $250,000 is what the employee thought they
> had.

Despite that recommendation, counsel for Providence explained to Salyers's counsel that Salyers was not entitled to the additional $220,000 because she had failed to submit evidence of insurability as required by the Plan. Salyers appealed to MetLife in a letter dated July 15, 2014.

After reviewing Salyers's appeal and the administrative claim file, MetLife responded that additional benefits were not payable because MetLife had not received and approved evidence of insurability for Gary as required by the Plan. MetLife claimed that its receipt of premiums did not create coverage.

In a letter dated August 12, 2014, Salyers's counsel appealed MetLife's formal denial. After another review of the claim file and Salyers's appeal letter, MetLife upheld its initial denial of benefits on the same grounds as before, and so notified Salyers by letter dated August 22, 2014. In that letter, MetLife explained that it re-examined the entire claim file and that no new information had been presented to change the denial decision.

Salyers then filed suit against MetLife in the U.S. District Court for the Central District of California. She claimed that MetLife should be estopped from contesting coverage or, in the alternative, that MetLife waived its right to enforce the evidence of insurability requirement. The district court conducted a bench trial on July 28, 2015, and concluded that Salyers had not sustained her burden of establishing an entitlement to the unpaid benefits. The district court entered judgment on August 14, 2015. This timely appeal followed.

**JURISDICTION AND STANDARD OF REVIEW**

This court has jurisdiction under 28 U.S.C. § 1291.  We review the district court's findings of fact for clear error and its legal findings de novo.  *See Pannebecker v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1213, 1217 (9th Cir. 2008).

**DISCUSSION**

Salyers raises three arguments on appeal: (1) MetLife waived the evidence of insurability requirement because it did not ask Salyers for a statement of health, even as it accepted her premiums for $250,000 in coverage; (2) MetLife should be estopped from contesting coverage based on the evidence of insurability requirement; and (3) MetLife did not conduct a full and fair review of Salyers's claim.  Because we conclude that MetLife waived the evidence of insurability requirement, we need not reach Salyers's other claims.

**A.  Salyers's Waiver Claim**

A waiver occurs when "a party intentionally relinquishes a right" or "when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished."  *See Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1559 (9th Cir. 1991).  Courts have applied the waiver doctrine in ERISA cases when an insurer accepted premium payments with knowledge that the insured did not meet certain requirements of the insurance policy.  *See, e.g.*, *Gaines v. Sargent Fletcher, Inc. Grp. Life Ins. Plan*, 329 F. Supp. 2d 1198, 1222 (C.D. Cal. 2004) (holding that an insurer waived its right to rely on evidence of insurability requirement as grounds for denial of benefits by receiving payments without "giving any indication" that the insured had failed to submit

evidence of insurability); *Pitts v. Am. Sec. Life Ins. Co.*, 931 F.2d 351, 357 (5th Cir. 1991) (finding waiver in ERISA action where insurer continued accepting payments after learning of plan participant's breach of policy requirements).

This is not, however, a straightforward waiver case, in which the insurer had actual notice of the facts and failed to act. As the district court found, MetLife and Providence created a system in which Providence was responsible for interacting with plan participants and MetLife remained largely ignorant of individual plan participants' coverage elections. Because of this compartmentalized system, until Salyers made her claim for benefits, MetLife did not know that (1) premiums had been deducted from Salyers's paycheck or (2) Salyers had elected coverage in an amount that required evidence of insurability under the Plan.

MetLife argues that, under the circumstances, its inaction—failing to ask Salyers for a statement of health—was not "so inconsistent with an intent to enforce" the Plan's evidence of insurability requirement as to constitute a waiver. *See Intel Corp.*, 952 F.2d at 1559; *see also Yale v. Sun Life Assur. Co. of Canada*, No. 1:12-cv-01429-AWI-SAB, 2013 WL 5923073, at *11 (E.D. Cal. Oct. 31, 2013) (holding that plaintiff failed to establish waiver of evidence of insurability requirement because insurer was unaware that plaintiff was required to—yet did not—submit evidence of insurability). Salyers contends that MetLife's purported ignorance of the facts does not negate its obligation to pay the entire $250,000 because, under agency law, Providence's knowledge and conduct may be attributed to MetLife. We agree.

## B.  Federal Common Law of Agency

### a.  Congress Authorized the Development of Federal Common Law under ERISA

In *UNUM Life Ins. Co. of Am. v. Ward*, the Supreme Court held that ERISA preempts state laws that deem a policyholder-employer an agent of the insurer in administering group policies.  526 U.S. 358, 379 (1999). The Court noted that automatically applying state agency rules in the ERISA context would force an employer to "assume a role . . . that it has not undertaken voluntarily" and affect "not merely the plan's bookkeeping obligations," but also "the basic services that a plan may or must provide to its participants and beneficiaries."  *Id.*  The Court's holding left open the opportunity for federal courts to apply agency law in the ERISA context as a matter of federal common law.

As the Supreme Court has recognized, Congress empowered courts to "develop a federal common law of rights and obligations under ERISA-regulated plans." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989) (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987) (internal quotation marks omitted)).  "Congress realized that the bare terms, however detailed, of [ERISA] would not be sufficient to establish a comprehensive regulatory scheme."  *Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1499 (9th Cir. 1984).  For example, given the complexity of employee benefit plans, the ERISA statutory scheme could not address every aspect of the relationships that develop between employees, employers, and insurers.  In this context, a federal common law of agency can "supplement[] the statutory scheme interstitially."  *Id.*

### b. Federal Common Law of Agency Furthers the Policy Goals of ERISA

In developing a body of federal common law governing employee benefit plans, we have the "obligation" to adopt a federal rule that "best comports with the interests served by ERISA's regulatory scheme." *PM Grp. Life Ins. Co. v. Western Growers Assur. Trust*, 953 F.2d 543, 546 (9th Cir. 1992). Congress specifically stated that it is "the policy of [ERISA] to protect . . . the interests of participants in employee benefit plans and their beneficiaries" and to "increase the likelihood that participants and beneficiaries . . . receive their full benefits." 29 U.S.C. §§ 1001(b), 1001b(c)(3). Common law principles of agency effectuate those policy goals.

The Restatement of Agency[3] defines agency as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006). The legal consequences of an agent's actions may be attributed to a principal when the agent is acting within its authority. Restatement (Third) of Agency § 2 intro. note (2006). Additionally, a principal is generally charged with notice of facts that an agent knows or has reason to know and that are material to her duties as an agent. Restatement (Third) of Agency § 5.03 (2006).

---

[3] The federal common law of agency has frequently been derived from the Restatement of Agency. *See, e.g.*, *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989) (citing the Restatement (Second) of Agency to give meaning to the term "scope of employment" in the Copyright Act).

These agency principles, which we adopt into the federal common law, further Congress's goals under ERISA by preventing insurers from evading their obligation to pay benefits. "Preempting state agency laws without replacing them . . . [gives insurers] little incentive to monitor ongoing administration, or to make sure that new information . . . reaches the beneficiaries." Joshua A.T. Fairfield, *ERISA Preemption and the Case for a Federal Common Law of Agency Governing Employer-Administrators*, 68 U. Chi. L. Rev. 223, 241–42 (2001). Adopting an agency rule as a matter of federal common law in this case would not "affect the actuarial soundness of the plan" or "fashion a new ERISA remedy." *Thrall v. Prudential Ins. Co. of Am.*, No. 3:05-CV-00067-RAM, 2008 WL 5156344, at \*4 (D. Nev. Dec. 5, 2008). Rather, applying the federal common law of agency with regard to direct interactions with the insured creates incentives for diligent oversight and prevents an insurer from relying "on a compartmentalized system to escape responsibility." *See Lesser v. Metro. Life Ins. Co.*, No. CV 09-5699 RSWL (CWx), 2010 WL 4916607, at \*5 (C.D. Cal. Nov. 24, 2010); *see also Kobold v. Aetna U.S. Healthcare, Inc.*, 258 F. Supp. 2d 1317, 1323–24 (M.D. Fla. 2003) (concluding that imputing the knowledge of an agent to its principal under federal common law of agency is consistent with ERISA policy); *Steinberg v. Mikkelsen*, 901 F. Supp. 1433, 1438–39 (E.D. Wis. 1995) (same).

## C.  Providence Acted as MetLife's Agent

The legal consequences of an agent's actions may be attributed to a principal when the agent has actual authority (express or implied) or apparent authority. Restatement (Third) of Agency § 2 intro. note (2006). "Express actual authority derives from an act specifically mentioned to be done in a written or oral communication." *NLRB v. District*

*Council of Iron Workers of the State of California and Vicinity*, 124 F.3d 1094, 1098 (9th Cir. 1997). "Implied actual authority comes from a general statement of what the agent is supposed to do; an agent is said to have the implied authority to do acts consistent with that direction." *Id.* "Apparent authority results when the principal does something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he purported to have." *Hawaiian Paradise Park Corp. v. Friendly Broad. Co.*, 414 F.2d 750, 756 (9th Cir. 1969).

We cannot say whether Providence was acting with express actual authority as an agent of MetLife, because the contract and other relevant communications between Providence and MetLife are not in the record. However, we have no trouble concluding that Providence had apparent authority, and perhaps even implied actual authority, to enforce the evidence of insurability requirement on MetLife's behalf.

Even when an insurer retains control over whether a submitted claim was eligible for benefits, a principal-agent relationship may still exist where the employer handles "nearly all the administrative responsibilities." *See Thrall*, 2008 WL 5156344, at *4–5. The district court found that "[t]he task of flagging policies for missing evidence of insurability was delegated to Providence," and "Providence was responsible for insuring that a statement of health or evidence of insurability accompanied Salyers' selection of coverage." We see no error in those findings. The Plan's enrollment guide informed plan participants that MetLife used the statement of health form to determine whether to approve coverage. MetLife retained final say on the form and contents of the statement of health document. Yet,

MetLife played no part in collecting it from plan participants.

A plan participant would have reasonably believed that Providence did not collect evidence of insurability of its own accord but on MetLife's behalf. Providence's direct interaction with plan participants, coupled with MetLife's failure to engage with Salyers about evidence of insurability, suggested that Providence had apparent authority on the collection of evidence of insurability. *See* Restatement (Third) Of Agency § 3.03 (2006) ("A principal's inaction creates apparent authority when it provides a basis for a third party reasonably to believe the principal intentionally acquiesces in the agent's representations or actions."). Therefore, we conclude that Providence was MetLife's agent for purposes of enforcing the evidence of insurability requirement.

Our holding in this case does not mean that a policy-holder employer is always an agent of the insurer in every aspect of plan administration in which it participates. The nature of the relationship between the employer and insurer and the nature of the interactions with the insured must be considered on a case-by-case basis. Accordingly, MetLife's concerns about an automatic agency rule are inapt.

### D. MetLife Waived the Evidence of Insurability Requirement

Because Providence was acting as MetLife's agent for purposes of collecting, tracking, and identifying inconsistencies with the evidence of insurability requirement, Providence's knowledge and conduct with regard to those matters are attributed to MetLife. *See* Restatement (Third) of Agency § 2 intro. note, § 5.03 (2006).

Providence knew or should have known that Salyers's 2014 coverage election required evidence of insurability, because Providence's system showed $250,000 in coverage. Despite having not received evidence of insurability from Salyers in 2014 or earlier, Providence began deducting premiums from Salyers's paycheck every two weeks between September 2013 and February 2014, in amounts corresponding to $500,000 in coverage for 2013 and $250,000 for 2014. Plus, just five days after Gary's death, having still not received evidence of insurability, Providence sent a letter to Salyers confirming coverage of $250,000.

The deductions of premiums,[4] MetLife and Providence's failure to ask for a statement of health over a period of months, and Providence's representation to Salyers that she had $250,000 in coverage were collectively "so inconsistent with an intent to enforce" the evidence of insurability requirement as to "induce a reasonable belief that [it] ha[d] been relinquished." *See Intel Corp.*, 952 F.2d at 1559; s*ee also Gaines*, 329 F. Supp. 2d at 1222. Accordingly, MetLife

---

[4] Several district courts in our circuit have held that waiver "cannot be used to create coverage beyond that actually provided by an employee benefit plan." *Flynn v. Sun Life Assur. Co. of Canada*, 809 F. Supp. 2d 1175, 1187 (C.D. Cal. 2011); *Yale v. Sun Life Assur. Co. of Canada*, No. 1:12-cv-01429-AWI-SAB, 2013 WL 5923073, at *13 (E.D. Cal. Oct. 31, 2013). But where, as here, premium payments have been accepted despite the plan participant's alleged noncompliance with policy terms, "giving effect to the waiver . . . does not expand the scope of the ERISA plan; rather it provides the Plaintiff with an available benefit for which he paid." *Gaines v. Sargent Fletcher, Inc. Grp. Life Ins. Plan*, 329 F. Supp. 2d 1198, 1222 (C.D. Cal. 2004).

waived the evidence of insurability requirement, and it cannot contest coverage on that basis.[5]

## CONCLUSION

The district court erred when it held that MetLife did not waive the evidence of insurability requirement. Accordingly, we **REVERSE** and **REMAND** with instructions to enter judgment in favor of Salyers for the amount of the $250,000 policy that remains unpaid.

---

[5] Generally, "[t]he doctrine of waiver looks to the act, or the consequences of the act, of one side only, in contrast to the doctrine of estoppel, which is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts." *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1559 (9th Cir. 1991) (internal citations and quotation marks omitted). We are mindful, however, of our previous statement that "in the insurance context, the distinction between waiver and estoppel has been blurred. . . . [I]t is consistent with ERISA to require an element of detrimental reliance or some misconduct on the part of the insurance plan before finding that it has affirmatively waived a limitation defense." *Gordon v. Deloitte & Touche, LLP Grp. Long Term Disability Plan*, 749 F.3d 746, 752-53 (9th Cir. 2014) (internal citations and quotation marks omitted). Assuming, without deciding, that our holding in *Gordon* applies beyond the waiver of a statute of limitations defense at issue in that case, the record reflects that Salyers detrimentally relied on Providence and MetLife's conduct, presumably by not buying other insurance. In a letter to Salyers, MetLife admits that "it appears that Ms. Salyers detrimentally relied on having Dependent Life Insurance great[er] than $30,000."