In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-3306

KENNETH J. BAUWENS, *et al.*,

*Plaintiffs-Appellants*,

*v.*

REVCON TECHNOLOGY GROUP, INC., *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-00707 — **Ronald A. Guzmán**, *Judge*.

ARGUED APRIL 17, 2019 — DECIDED AUGUST 13, 2019

Before MANION, SYKES, and BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Two companies set up a pension plan for their employees, then withdrew from it. This triggered federal requirements that the companies contribute to the plan. This withdrawal liability became the subject of a dance between the companies and the pension plan's trustees: defaults and lawsuits, followed by partial payments and dismissals of the lawsuits.

The most recent lawsuit was dismissed as time-barred. On appeal the trustees ask us to create a federal common law mechanism which would allow them to decelerate the withdrawal liability they previously accelerated. This would, in turn, preserve the timeliness of their claim. We say "create" because the statute makes no mention of such a deceleration mechanism. We decline to do so, and agree the plan trustees' claim is time-barred.

## I.

Plaintiffs serve as trustees of a pension plan for unionized electrical workers governed by the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (ERISA). Several decades ago, the unions set up the pension plan with defendants Revcon Technology Group and S & P Electric, two electrical contractors that share common ownership.[1] Revcon withdrew from the plan completely in 2003; S & P followed a year later. The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. § 1381 *et seq.*, requires employers who withdraw from underfunded pension plans to pay a withdrawal liability, either in installments or a lump sum. In 2006, the plan's trustees notified the companies they owed $394,788 in withdrawal liability and demanded payment in eighty quarterly payments of $3,818, starting in October 2006.

In 2008, after Revcon missed several payments, the trustees informed defendants of their defaults and demanded immediate payment. When Revcon still failed to pay after 60

---

[1] Because Revcon and S & P are considered a single employer under ERISA, and are jointly and severally liable for all withdrawal claims, we refer to the two companies collectively as "Revcon" unless otherwise indicated.

days, the trustees accelerated the outstanding liability under 29 U.S.C. § 1399(c)(5) and filed suit in the Northern District of Illinois for the entire amount plus interest, totaling $521,553. Before appearing in the case, Revcon offered to cure its defaults and resume making quarterly payments in exchange for the trustees' dismissal of the lawsuit. The trustees agreed and voluntarily dismissed the suit under FED. R. CIV. P. 41(a).

Revcon cured its defaults, made three more payments, then defaulted again in April 2009. The trustees again sued seeking the defaulted payments and the entire outstanding balance, now $492,988. Revcon again promised to cure its defaults and resume making payments, and the trustees again voluntarily dismissed the suit under FED. R. CIV. P. 41(a).

The parties repeated this cycle of default, lawsuit, promise to cure, and voluntary dismissal three more times in 2011, 2013, and 2015. All the complaints were identical, except that the total withdrawal liability due changed as interest accrued and Revcon made certain payments. And each complaint referred to the debt acceleration in 2008, making no claim the acceleration was ever revoked. Finally, in 2018, after yet another default by Revcon, the trustees filed this case. The 2018 complaint differs from its five predecessors in that, instead of claiming the entire outstanding withdrawal liability, it claims only the delinquent payments (plus interest) that Revcon had missed since the last voluntary dismissal in 2015, $33,239.98.

Rather than repeat this cycle for a sixth time, Revcon moved to dismiss the case. Revcon argued claim preclusion applied because the five previous complaints demanded the entire withdrawal liability, which necessarily includes the defaulted payments currently at issue. The "two dismissal rule" of FED. R. CIV. P. 41(a)(1)(B) therefore barred the trustees from

raising any claims arising from the withdrawal liability.[2] By the same reasoning, Revcon argued, because the trustees first sought to collect the entire debt in 2008, the six-year statute of limitations expired in 2014.

The trustees countered that they revoked the 2008 acceleration of the withdrawal liability when they voluntarily dismissed the 2008 Complaint. The trustees argued each of the subsequent dismissals had the same decelerating effect. The trustees claimed the two dismissal rule did not apply because all parties consented to the previous dismissals by stipulation in spirit (though, admittedly, they were dismissals by notice in form).

The district court agreed with Revcon that this case was untimely filed. It noted that the trustees' 2009, 2011, 2013, and 2015 complaints all stated the withdrawal liability was accelerated in 2008, which belied the trustees' argument that acceleration had been revoked. Holding the trustees to their earlier pleadings, the district court dismissed the case.

## II.

The arguments on appeal are the same as in the district court. We review de novo an order dismissing a case based on the statute of limitations. *Orgone Capital III, LLC v. Daubenspeck*, 912 F.3d 1039, 1043 (7th Cir. 2019).

---

[2] Rule 41(a)(1)(B) states in relevant part: "But if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits."

Both of the trustees' arguments hinge on whether they possessed the ability to revoke the acceleration of, or "decelerate,"[3] Revcon's withdrawal liability. We first address whether pension plans and employers can decelerate accelerated withdrawal liability under the MPPAA. We then resolve the trustees' statute of limitations and res judicata arguments.

The MPPAA expressly permits pension plans to accelerate the entire outstanding withdrawal liability if an employer defaults on an installment payment. Plan trustees send the employer a written notification of default and wait 60 days, during which the employer may cure the default. 29 U.S.C. § 1399(c)(5). If the default is not cured, the plan may call the entire amount due. *Id.*

But what if the parties agree they want to return to the installment payment plan? Can they decelerate the previously accelerated debt? The MPPAA is silent on this question. Revcon argues this silence means accelerated withdrawal liabilities cannot be decelerated under the MPPAA. The trustees construe the MPPAA's silence as a "gap" this court should fill by creating a deceleration mechanism.

We usually balk at any request to invent statutory mechanisms wholesale with no textual anchor, even where doing so would seem to make the statute fairer. *See Anderson v. Wilson*, 289 U.S. 20, 27 (1933) (Cardozo, J.) ("We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take the statute as we find it.").

---

[3] Throughout this litigation, the parties refer to the undoing of the acceleration as "revoking acceleration," but in federal court the phenomenon is commonly referred to as "deceleration," so we use that term.

But as the trustees note, this is an ERISA case. (The MPPAA amended ERISA). The Supreme Court has instructed federal courts "to develop a 'federal common law of rights and obligations under ERISA-regulated plans.'" *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987)). Even so, this does not mean federal courts may rewrite ERISA wholesale. "[B]ecause ERISA is a highly technical statute[,] our part is to apply it as precisely as we can, rather than to make adjustments according to a sense of equities in a particular case." *Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184, 1190 (7th Cir. 1994).

Courts vary in their willingness to create ERISA common law doctrines. Some circuits create them regularly and have articulated tests for when a common law right or remedy should be created. *See, e.g.*, *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 939–40 (9th Cir. 2017) (adopting principles of agency law); *Bloemker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436, 440–42 (6th Cir. 2016) (recognizing a federal common law claim for equitable estoppel); *Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1452–53 (4th Cir. 1992) (approving of the adoption of state common-law causes of action under ERISA, even when they were preempted by ERISA).

Our circuit has consistently refused to create federal common law remedies or implied causes of action under ERISA. *See, e.g.*, *Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. Coll. of Wis., Inc.*, 657 F.3d 496, 503–04 (7th Cir. 2011) (implying in dicta that there is no federal common law remedy for unjust enrichment under ERISA); *Buckley Dement, Inc. v. Travelers Plan Adm'r of Ill., Inc.*, 39 F.3d 784, 790 (7th Cir. 1994) (refusing to create a claim against a nonfiduciary); *UIU Severance Pay*

*Tr. Fund v. Local Union 18-U*, 998 F.2d 509, 512 (7th Cir. 1993) ("We have been … extremely reluctant to find that ERISA creates certain causes of action by implication … ."); *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 541 (7th Cir. 1991) (refusing to create federal common law when plaintiff's argument "concerned the distinct question of whether ERISA creates a remedy against parties … for violations of these 'rights and obligations'").

Our research uncovers only a few examples where this circuit has created ERISA federal common law. One concerned equitable estoppel. *See Trustmark Life Ins. Co. v. Univ. of Chicago Hosp.*, 207 F.3d 876, 882–84 (7th Cir. 2000). Our rationale was simple: "estoppel principles generally apply to *all* legal actions." *Black v. TIC Inv. Corp.*, 900 F.2d 112, 115 (7th Cir. 1990) (emphasis added). Even so, we apply equitable estoppel principles narrowly. *Buckley Dement*, 39 F.3d at 790. A second example, the right of a spouse to waive rights to ERISA insurance benefits in a divorce settlement, was eventually abrogated by the Supreme Court. *See Fox Valley & Vicinity Const. Workers Pension Fund v. Brown*, 897 F.2d 275 (7th Cir. 1990) (en banc), *abrogated by Kennedy v. Plan Adm'r for DuPont Sav. and Inv. Plan*, 555 U.S. 285 (2009). *See also Metropolitan Life Ins. Co. v. Johnson*, 297 F.3d 558, 566-67 (7th Cir. 2002) (creating common law rule of substantial compliance for change-of-beneficiary forms for ERISA-governed life insurance plans).

Against that backdrop, we return to deceleration. The Supreme Court instructs that withdrawal liability under the MPPAA is subject to "general principles governing installment obligations." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 195 (1997).

The trustees insist that deceleration is one such general principle: that much like equitable estoppel, deceleration is always available when debt is accelerated. As such, they argue, we should adopt a federal common law mechanism to decelerate withdrawal liability under the MPPAA.

It is true that the most common forms of accelerated debt—foreclosed mortgages and bankruptcy debt—can be decelerated under certain circumstances. Yet the trustees omit a key detail: such debts can be decelerated only when a contract or statute expressly authorizes deceleration. Mortgages typically include such a clause, permitting the parties to decelerate home debt following foreclosure if certain contractual requirements are met. *See, e.g.*, *Bartram v. U.S. Bank Nat. Ass'n*, 211 So.3d 1009, 1013–14 (Fla. 2016) (discussing the mortgagor's right to decelerate under the "Right to Reinstate After Acceleration" in his mortgage note). Likewise, the Bankruptcy Code makes a point to expressly authorize deceleration in particular scenarios. *See* 11 U.S.C. § 1322(b); *see also Anderson v. Hancock*, 820 F.3d 670, 673–76 (4th Cir. 2016) (determining whether a loan accelerated in bankruptcy could be decelerated based on the text of § 1322(b)). Absent some contractual or statutory foundation, there is no free-floating "general principle of contract law" that allows any accelerated debt to be decelerated. The trustees' characterization of deceleration as a "general principle[] governing installment obligations" is without foundation.

Even were we inclined to create an MPPAA deceleration mechanism, we could not define its contours. With no textual anchor, nothing would guide courts in deciding when a deceleration had occurred. The trustees point us to a

hodgepodge of foreclosure cases, claiming we can discern requirements for a deceleration test from among them. Those authorities are little help: nearly every state's law applies different requirements and different presumptions for deceleration.

There is a reason for this confusion: deceleration of foreclosed mortgages is a matter of contract interpretation, colored by principles of property law. Each mortgage note can have different requirements for deceleration, and every state has its own mortgage laws. None of them are relevant to the MPPAA. *Cf. Fox Valley*, 897 F.2d at 284 (Ripple, J., dissenting) ("The ultimate objective [of ERISA] is not to fulfill policy objectives of state law but to fulfill the congressional command embodied in the language and structure of the federal statute.").

Finally, if Congress had wanted to include a right to decelerate in the MPPAA, it could have done so. The concept of deceleration is not novel to Congress. Just two years before Congress passed the MPPAA, it enacted the original Bankruptcy Code, which included a provision detailing the right to decelerate debt. *See* An Act to establish a uniform Law on the Subject of Bankruptcies, Pub. L. No. 95-598, § 1322(b), 92 Stat. 2549, 2648 (1978). If Congress wants to amend the MPPAA to add a deceleration mechanism, it is free to do so. But here Congress did not, Congress has not, and we will not step in where Congress has chosen not to act.

There is no "general principle" that any accelerated debt can be decelerated. Nor is there a statute authorizing deceleration of accelerated withdrawal liability under the MPPAA. So the trustees cannot decelerate Revcon's withdrawal liability.

**III.**

Without deceleration, the trustees' claim is time-barred. The MPPAA mandates that claims for unpaid withdrawal liability "may not be brought after the later of (1) 6 years after the date on which the cause of action arose, or (2) 3 years after the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action … ." 29 U.S.C. § 1451(f). If the withdrawn employer is on an installment plan, no cause of action arises until the employer defaults on an installment. *Bay Area Laundry*, 522 U.S. at 202. As the plan has no right to sue to collect installment payments before they are due, a new cause of action arises each time the employer defaults on another installment, and with each default a new statute of limitations clock begins to toll. *Id.* at 206–10.

If the plan accelerates the withdrawal liability, however, the statute of limitations for the entire liability begins to run on the date of acceleration, as at that time the plan has the right to sue for the entire accelerated amount. *Id.* at 209 n.5; *Central States, Se. and Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 918 (7th Cir. 2001) ("The Supreme Court made clear in *Bay Area* that the statutory requirement does not prevent the fund from accelerating all future payments upon default, … thus making all the installments due at once.") (citation omitted).

The trustees do not dispute that they accelerated the withdrawal liability in 2008. Their only argument below and on appeal is that they decelerated the debt, so the statute of limitations clock did not begin to run until later defaults. We have already rejected that argument. The trustees' complaint results in the statute of limitations beginning to run in 2008,

when the withdrawal liability was accelerated. Both parties agree that the six-year statute of limitations applies. Thus, the trustees' claim for the accelerated debt expired in 2014. Because Revcon's statute of limitations defense was established on the face of the trustees' complaint, the district court properly dismissed the complaint. *See Orgone Capital*, 912 F.3d at 1043–44.

Other avenues of redress may be open for the trustees. Each time they filed a claim against Revcon, Revcon agreed in writing to pay them in exchange for dismissing the suit. These negotiations appear to have given rise to a series of successive settlement agreements. But such issues are not before us, as the trustees did not plead breach of contract. Such a claim may still be available in state court. Their ERISA claim, however, is time-barred.

## IV.

The trustees' ERISA claim expired five years ago. Any further claims for relief must be sought under a different theory in a court of proper jurisdiction. For these reasons we AFFIRM the district court's judgment.